**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ELIZABETH A. KARPEL,
Plaintiff-Appellant,

v.

INOVA HEALTH SYSTEM SERVICES, t/a
INOVA Health System, t/a
Cameron Glen Care Center,
Defendant-Appellee.

No. 97-1279

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Richard L. Williams, Senior District Judge.
(CA-96-347)

Argued: December 3, 1997

Decided: January 27, 1998

Before MURNAGHAN, ERVIN, and LUTTIG, Circuit Judges.

_____

Affirmed by published opinion. Judge Ervin wrote the opinion, in
which Judge Murnaghan and Judge Luttig joined.

_____

**COUNSEL**

**ARGUED:** Cheryl Kornblatt Brunner, Manassas, Virginia, for Appel-
lant. Stephen William Robinson, MCGUIRE, WOODS, BATTLE &
BOOTHE, L.L.P., McLean, Virginia, for Appellee.

_____

**OPINION**

ERVIN, Circuit Judge:

Elizabeth Karpel, an African-American nurse, sued her former employer, Inova Health System Services, on claims of racial discrimination and retaliation. The district court granted summary judgment for Inova on all counts. Finding no error, we affirm.

I.

In January 1992, Ms. Karpel was hired as a Licensed Practical Nurse (LPN) by Cameron Glen Care Center, an affiliate of Inova. Karpel had 18 years of experience as an LPN.

The incident that Karpel believes precipitated her employment problems took place in February 1993. In the "Gonzalez incident," Karpel filled out a Quality Care Control Report indicating that a white LPN failed to resuscitate Garcia Gonzalez, a patient at the facility, even though there was no Do Not Resuscitate order. An Advanced Directive was found later, indicating that Gonzalez did not want resuscitation, and the hospital only gave the white LPN verbal counseling regarding the breach of hospital policy. Karpel claims that the white nursing staff reacted negatively to a black nurse criticizing a white nurse, and began a "campaign of harassment" directed against her.

In March of 1993, Karpel received a verbal warning for pre-pouring medication, although she denied pre-pouring it. Later that month, she had an unsatisfactory "medpass" (observation by a nursing supervisor of a nurse passing medications to residents) with a 22% error rate. In April she received a written warning (later reduced to verbal) as a result of her unsatisfactory medpass and for miswriting a DNR order. In May 1993 Karpel filed a charge of discrimination with the EEOC.

On July 8, 1993, Karpel received a written warning for eating in the lounge. On July 12 a memo was issued to clarify the eating policy. It stated that, effective July 14, there would be no eating allowed on

the unit. On July 13, however, the day before the clarified policy was to take effect, Karpel received another written warning for eating in the lounge on that day.

On July 23, 1993, the "Kaopectate incident" took place. In violation of general nursing practice, Karpel charted the medication prior to administering it. She also violated nursing practice by destroying that page on the patient's chart and by failing to report her errors properly. Karpel claims that she destroyed the notes and rewrote them because they were too messy to read, and alleges that white nurses have destroyed nursing notes without being disciplined for this violation of policy.

As a result of the Kaopectate incident, Karpel was placed on administrative leave on July 23 and the incident reported to the Virginia Department of Health Professionals. Karpel was given a written warning about the incident on August 16, but it was eventually removed from her file as part of the grievance procedure. In addition, in January the Acting Administrator of Cameron Glen informed the Department of Health Professionals that the incident should never have been reported.

In August 1993, Karpel was transferred from the Shepard's Way unit to the Williamsburg unit. There was no reduction in wages or benefits, but the transfer adversely affected Karpel's shift schedule and forced her to work in a smoking environment, aggravating her hypertension. Inova claimed that the transfer was made so that Karpel could receive closer supervision and so there would be other LPNs available to relieve her for meals. Karpel had complained from the beginning of her employment that white nurses were relieved for meals and breaks, while she was not. According to Regina Freestone, the Director of Nursing, Karpel could not be relieved while on Shepherd's Way because she was the only LPN on duty there; multiple LPNs worked in the Williamsburg unit.

Karpel requested in writing that she be transferred back to Shepherd's Way. Although the letter did not mention her problem with smoke, the administration heard of her difficulties with the smoke through Human Resources. Karpel was told there were no openings on the Shepherd's Way unit immediately available. Karpel argued

3

that because a smoker was transferred from Williamsburg to Shepherd's Way in order to move her onto that unit, the switch could merely have been undone. According to Inova administrators, this was not considered.

On January 5, 1994, Karpel discussed with Freestone the possibility of a transfer to another unit because of her concerns about the smoke on the Williamsburg unit. According to Freestone, Karpel refused the suggested transfer, and no other openings for LPN became available on any other unit before Karpel's termination.

On January 12, 1994, Karpel received a verbal warning for continued medpass errors, and on January 19 had a medpass with a 17% error rate. Also in January, she was counseled about her repeated tardiness. On February 14, Karpel received an unsatisfactory evaluation. Her tardiness, eating in the lounge, poor medication passes, and failure to complete monthly summaries were all identified as areas in which she needed to show improvement. Her written comments to the evaluation indicate that she believed it to be a result of racial discrimination and retaliation, and that she was one of the best nurses at Cameron Glen.

On February 15, Karpel was given a day of decision-making leave; she indicated on her return that she would continue her employment at Cameron Glen. Later in February, Karpel was told she needed to take leadership classes. She indicated to her supervisors that they needed to inform her attorneys why she should attend the classes and that she did not plan to attend them -- although she did later agree to attend on the advice of her attorneys. The earliest date she would have been able to attend the classes was in April. On February 28, Karpel sent a letter to Freestone, indicating that further correspondence from Inova should be sent to her attorneys. In her deposition, Karpel explained that she did not intend this to apply to job-related communications.

On March 14, Karpel was terminated by Inova. The reasons given for her termination were her refusal to participate in her employee development plan, refusal to discuss her employment development with her supervisor, failure to complete monthly summaries, and

4

excessive tardiness. Karpel was the only nurse who failed to complete any monthly summaries.

To support her claim of racial harassment, Karpel points to a number of incidents in which she alleges Inova responded differently according to the race of the nurse involved. She first points to the Gonzalez incident, described above, in which the white LPN allegedly at fault was given only verbal counseling. She also directs us to the "Chapman incident," in which a white male nurse abused a young, black, quadriplegic patient by roughing him up and taking his temperature rectally against his wishes. Karpel alleges that Inova refused to take any action until 45 days later, when it received corroborating testimony from two staff members. The male nurse was then reported to the state board and terminated by Inova. Finally, she points to the Kaopectate incident, described above, following which Karpel was put on administrative leave and reported to the state board.

After being terminated by Inova, Karpel worked as a nurse at Camelot Hall. She was terminated there when the administration at Camelot Hall discovered that she had failed to list her employment at Cameron Glen on her application. Karpel claims that she did not disclose her employment at Inova to Camelot Hall because she feared what her former employers might say about her.

Karpel brought suit against Inova, alleging violation of the Civil Rights Act of 1866, violation of Title VII, and other claims. Inova moved for and, after oral argument, was granted summary judgment on all counts. Karpel appeals, arguing the district court erred in granting summary judgment on her hostile work environment, racial discrimination, and retaliation claims.

II.

We review a district court's grant of summary judgment de novo. See Higgins v. E.I. Dupont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." See Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether a genu-

5

ine issue of material fact is in dispute, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

III.

Karpel contends that her complaint set forth a claim for relief for racial harassment based on a hostile work environment, citing language in her complaint alleging that Inova engaged in "unlawful employment practices" and that she was "continually harassed." She further argues that this claim should proceed to trial because Inova failed to move for summary judgment on the claim. Because Karpel failed adequately to set forth her hostile work environment claim in the district court, we affirm summary judgment on the claim.

Under the liberal pleading requirements of the Federal Rules of Civil Procedure, it is not necessary for a plaintiff to set out in detail the facts upon which her claim is based. All that is required in a pleading is a "a short and plain statement of the claim showing that the pleader is entitled to relief." See Fed.R.Civ.P. 8(a)(2). The main purpose of the complaint is to provide the defendant"fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957); Comet Enters. Ltd. v. Air-A-Plane Corp., 128 F.3d 855, 860 (4th Cir. 1997).

Even under the liberal standards of the Federal Rules of Civil Procedure, however, a plaintiff "must at least set forth enough details so as to provide defendant and the court with a fair idea of the basis of the complaint and the legal grounds claimed for recovery." Self Directed Placement Corp. v. Control Data Corp., 908 F.2d 462, 466 (9th Cir. 1990) (citations omitted). Karpel's complaint notably failed to include any details by which defendant Inova or the district court could have been put on notice that she intended to pursue a hostile environment claim. Indeed, not until after summary judgment had already been granted by the district court did Karpel submit the depositions which include the factual allegations upon which such a claim might be predicated. Consequently, the district court's grant of summary judgment properly included Karpel's hostile environment claim.

6

Karpel's failure to raise this claim in the district court means that this court will not consider it. We have repeatedly held that issues raised for the first time on appeal generally will not be considered. See, e.g., Muth v. United States, 1 F.3d 246, 250 (4th Cir. 1993); National Wildlife Federation v. Hanson, 859 F.2d 313, 318 (4th Cir. 1988). "Exceptions to this general rule are made only in very limited circumstances, such as where refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice." Muth, 1 F.3d at 250 (citing Hanson, 859 F.2d at 318). We can find no evidence in the record that such circumstances exist here.

IV.

Karpel next contends that the district court erred in granting summary judgment on her race-based discrimination claim under Title VII. We find, however, that Karpel failed to establish the necessary element of intentional discrimination on the part of Inova, and therefore affirm the district court's grant of summary judgment.

Section 703(a) of Title VII of the Civil Rights Act of 1964 states that:

> It shall be an unlawful employment practice for an employer --
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race....

42 U.S.C. § 2000e-2(a) (1994). Under Title VII, the plaintiff bears the initial burden of proving a prima facie case of discrimination by raising an inference that the defendant acted with discriminatory intent. Wileman v. Frank, 979 F.2d 30, 33 (4th Cir. 1992). This can be done either through direct evidence of discriminatory intent, or by using the four-part McDonnell Douglas scheme which provides an inference of discriminatory intent. Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). In this case, that would require Ms. Karpel

7

to show: "(1) that she is a member of a protected class; (2) that she was qualified for her job and her job performance was satisfactory; (3) that, in spite of her qualifications and performance, she was fired; and (4) that the position remained open to similarly qualified applicants after her dismissal." Williams v. Cerberonics, Inc., 871 F.2d 452, 455 (4th Cir. 1989) (citing McDonnell Douglas, 411 U.S. at 802; Holmes v. Bevilacqua, 794 F.2d 142, 146 (4th Cir. 1986) (en banc)).

Karpel fails to make a prima facie showing of discrimination under either approach. The record is devoid of any direct evidence of discriminatory intent. Karpel alleges that intent can be inferred from Inova's attempts to "build up a file" on her. She fails to present evidence, however, that Inova's recording of her deficiencies as an employee was racially motivated or that she was written up differently from other similarly situated employees. Cf. Few v. Yellow Freight Sys., Inc., 845 F.2d 123, 124-25 (6th Cir. 1988) (discriminatory intent found where record showed dramatic increase in write-ups and that plaintiff was treated differently from similarly situated male employees).

Because the record clearly demonstrates that Karpel's job performance was unsatisfactory, we are also unable to infer discriminatory intent under the McDonnell Douglas scheme. Karpel was repeatedly tardy, had multiple inadequate medpasses, and failed to submit any of her required monthly summaries. Karpel does present evidence that there were other employees who were late, or had inadequate medpasses, or were delinquent in submitting their monthly summaries. This does not nullify the fact that Karpel's job performance was inadequate. As the district court correctly observed in its grant of summary judgment, "It would defy logic to look at each sort of attendance, disciplinary, or performance problem in a vacuum; it is the conglomeration of these issues that made Ms. Karpel an unsatisfactory employee that Inova was justified in terminating." See also Cook v. CSX Trans. Corp., 988 F.2d 507, 512 (4th Cir. 1993) ("[T]o focus on one piece of the record without considering the whole would distort the permissible inferences to be drawn."). Karpel presents no evidence that any other employee had nearly the same problems as she did across the board. Neither does she dispute the evidence showing that she was the only nurse who failed to complete any of the required monthly summaries. In short, the evidence that Karpel's job

8

performance was unsatisfactory is overwhelming. Any attempt to infer discriminatory intent on the part of Inova therefore fails on the second prong of the McDonnell Douglas test.

V.

Finally, Karpel argues that the district court erred in granting summary judgment on her retaliation claims. Two such claims were advanced: retaliatory actions during her original employment with Inova and retaliatory action that caused her to be discharged from her subsequent job with Camelot Hall.

Under section 704(a) of Title VII, it is an "unlawful employment practice for an employer to discriminate against any[employee] ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (1994). The series of proofs and burdens outlined in McDonnell Douglas apply to retaliation claims. See Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985). Therefore, in order to establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the employer took adverse action, and (3) there was a causal connection between the two. Id. The burden then shifts to the employer to produce a legitimate nondiscriminatory reason for the adverse action. Id. If the employer does so, the plaintiff then bears the burden of showing that the employer's proffered reason is pretextual. Id.

A

Karpel successfully established a prima facie case of retaliation during her employment at Inova. She clearly engaged in protected activity when she filed her EEOC complaint, and Inova took adverse actions when it transferred her to a smoking unit, investigated her for allegedly wrongfully administering medication, and later terminated her. Although Karpel presents little or no direct evidence of a causal connection between her protected activity and Inova's adverse action, little is required. See, e.g., McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991) (plaintiff stated prima facie case even though there

9

was no evidence of causal connection other than the fact that plaintiff was fired after bringing a lawsuit). Karpel therefore established a prima facie case of retaliation based on Inova's actions while she was employed with them.

Inova, however, has also met its burden by advancing legitimate, nondiscriminatory reasons for its adverse actions. Inova stated that it transferred Karpel to a smoking unit so she could receive increased supervision and to allow her to be relieved for meals, as she had requested. Inova stated that she remained in the smoking unit because it had no suitable position open for her in a non-smoking unit, and the record shows that Freestone did offer Karpel a transfer after Freestone became aware of Karpel's problems with smoke, but Karpel refused this transfer. According to Inova, no other suitable openings became available before her termination. Karpel has presented no evidence to rebut the reasons given by Inova for her transfer to a smoking unit or to show them to be pretextual. Karpel alleges that pretext could be inferred from Inova's failure to consider simply undoing the original transfer. This allegation is unsubstantiated, especially in light of the fact that Inova made at least some effort to transfer Karpel onto a non-smoking unit once it became aware of her preference. Because she presented no evidence that the reasons given for her transfer were pretextual, Karpel failed to raise a genuine issue of material fact.

The obvious, non-retaliatory explanation for investigating the incident in which Karpel was alleged to have wrongfully administered medication (the "Kaopectate incident"), is that Inova reasonably believed that the allegations could be true. In addition, Karpel admits to destroying a page in the patient's chart, in violation of nursing practice. Karpel seeks to establish that reporting this incident to the state board was pretextual by pointing to the Gonzalez and Chapman incidents. These incidents involved very different types of professional breaches and are therefore difficult to compare. However, in the Gonzalez incident, the white nurse involved was disciplined, even though she was not reported to the state board. The white nurse who assaulted Chapman was reported as soon as Inova confirmed that the incident had occurred. Because any differences in reporting these three incidents can be credited to the differences in the incidents themselves, Karpel fails to create a genuine issue of material fact.

10

Inova's termination of Karpel was based on her unsatisfactory job performance, including her tardiness and failure to complete her monthly summaries. Karpel's problems in these areas are well-documented, and she presented no evidence showing that the reasons given by Inova for her termination were pretextual. Because she is unable to meet her ultimate burden of persuasion that the legitimate, nondiscriminatory reasons Inova proffers for its adverse actions during the course of her employment there are pretexts, we affirm the district court's grant of summary judgment.

B

Karpel also argues that Inova retaliated against her after her termination by informing her next employer that she had worked at Cameron Glen. The district court held that this could not have constituted an adverse employment action because Karpel's employment with Inova had terminated by that time. Since the district court's decision, however, the Supreme Court has overturned the case upon which this holding was based, Robinson v. Shell Oil Co., 70 F.3d 325, rev'd, 117 S. Ct. 843 (1997). In Robinson the Supreme Court, reversing this circuit, held that the term "employees" in § 704(a) of Title VII is to be construed to include former employees. 117 S. Ct. at 849.

We do not need to decide whether the Supreme Court's Robinson decision applies retroactively to Inova's actions against Karpel after she had been terminated because, even assuming arguendo that the decision is retroactive, Inova's action in informing Camelot Hall of Karpel's former employment at Cameron Glen does not constitute "adverse action." There is no evidence that Freestone did anything more than disclose that Karpel had worked for Inova; Freestone did not reveal anything about Karpel's employment history or any pending litigation. Karpel's subsequent termination from her Camelot Hall employment was based on the fact that she had fraudulently failed to reveal her period of employment at Inova to her new employer. In the absence of any adverse action on the part of Inova, Karpel fails to establish a prima facie case of retaliation after her termination.

VI.

In conclusion, we hold that because Karpel failed to raise her hostile work environment claim in the district court, she is precluded

11

from bringing this claim on appeal. In addition, because Karpel failed to establish the necessary element of intentional discrimination on the part of Inova, we affirm the district court's grant of summary judgment on her race-based discrimination claim. Finally, we affirm summary judgment on Karpel's retaliation claims because she was unable to rebut Inova's legitimate, nondiscriminatory reasons for its adverse actions during the course of her employment and failed to show Inova took any adverse action against her after her termination. Accordingly, the judgment of the district court is affirmed.

AFFIRMED