Keith SMITH, Plaintiff,

v.

**UNITED PARCEL SERVICE, INC., Defendant.**

**No. CIV. 1:98CV109.**

United States District Court, W.D. North Carolina, Asheville Division.

June 11, 1999.

George W. Moore, Asheville, NC, for Keith Smith, plaintiff.

John J. Doyle, Jr., Jill S. Stricklin, Constangy, Brooks & Smith, Winston–Salem, NC, for United Parcel Service, Inc., defendant.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendant's motion for summary judgment, opposed by the Plaintiff. For the reasons stated herein, the Defendant's motion is granted and the action is dismissed.

## I. STATEMENT OF FACTS

This action is unique in that the parties agree on the facts although their inferences therefrom differ. Keith Smith, an African American male, was employed by United Parcel Service, Inc. (UPS) as a package car driver from June 1988 until September 1996 when he was discharged for dishonesty. Plaintiff admitted the allegations of dishonesty; that he violated UPS procedures involving cash on delivery (COD) packages and funds. Although more than one incident was involved, two particular incidents show the nature of the wrongdoing. On September 6, 1996, Plaintiff delivered a COD package to H. Rubin on Tunnel Road in Asheville, North Carolina. Plaintiff admits that he left the package there without collecting the $565 due on behalf of the shipper, a violation of UPS policy. Deposition of Keith Smith, *attached to* Plaintiff's Response to Defendant's Motion for Summary Judgment, filed June 2, 1999, at 154. Two days later, he collected the funds but at the end of his workday, Smith realized he was $50 short. *Id.*, at 158–160. According to UPS policy, when a driver is short at the end of his shift, he must report this to a supervisor. *Id.* One reason for this rule is to avoid an appearance that the driver is "kiting" or using the money which actually belongs to the shipper. *Id.*, at 160–62. Smith failed to report the shortage to his supervisor and also did not turn in the money on that date. Instead, he waited until two days later when he replaced the $50. *Id.*, at

171. Smith falsified numerous documents in order to prevent disclosure of his conduct and forged a signature as well. *Id.*, at 165–70, 179–80. In his deposition, Smith implied that Rubin had shorted him the $50 but admitted that he never returned to Rubin to collect the deficiency. *Id.*, at 163. Smith also testified that "none of this would have happened" if Rubin had refused delivery of the package on the delivery date when Rubin did not have the $565 due. *Id.*, at 174. It is a violation of UPS policy for a driver to leave a package without collecting the COD due.

During the investigation of the above incident, UPS employees learned that Smith had engaged in irregularities involving packages sent COD to his personal business, Keith's Equipment Company. Smith testified that when a COD package was sent to his business, the driver on that route, Daryl Lyda, would notify him and either give him the package without collecting the COD or leave it in "will call," meaning the consignee would pick up the package and pay the money. *Id.*, at 115–117. For example, on July 18, 1996, Smith received a package with $210.88 due on the COD; but he did not pay it until two weeks later, at which time he improperly listed the delivery and COD turn-in to avoid detection. *Id.*, at 133, 138–40. Ultimately, UPS was contacted by one of the shippers, N Form Products, who complained of considerable delays in receiving COD proceeds from shipments delivered to Smith's company, sometimes as long as one month. *Id.*, at 143–45.

When Smith was confronted by his supervisors, he admitted his conduct, acknowledged it was both wrong and contrary to company policy and signed a written statement to that effect. *Id.*, at 180. In that statement, Smith acknowledged that he took COD packages addressed to his business out of the UPS building without payment on more than one occasion. Exhibit 24, *attached to* Smith Deposition, *attached to* Defendant's Motion for Summary Judgment, filed May 21, 1999. Contrary to his response to the motion for summary judgment, Smith made no allegations against Lyda in this statement. Smith was offered the option of resigning instead of being terminated, but he declined. Affidavit of Clark Ross, filed June 9, 1999, at 4. As a result, he was terminated for dishonesty. Smith filed a grievance with his union which determined that his termination was justified.

Plaintiff's complaint alleges he was discharged due to his race. In response to the motion for summary judgment, Plaintiff claims for the first time that he was subjected to disparate treatment because white employees committing the same violations received more lenient disciplinary treatment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Defendant as the moving party has the initial burden to show a lack of evidence to support the Plaintiff's case. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If that showing is made, the burden then shifts to the Plaintiff who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." Id. A "mere scintilla of evidence" is not sufficient to defeat summary judgment. Id. Moreover, in considering the facts of the case for purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving

party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

■ Defendant claims Smith has failed to make a *prima facie* case and in the alternative, has failed to show its reason for the discharge is pretextual. "Under Title VII, the plaintiff bears the initial burden of proving a *prima facie* case of discrimination by raising an inference that the defendant acted with discriminatory intent." *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir.1998). In a case such as this one where there is no direct evidence of discriminatory intent, a plaintiff alleging racial discrimination may show a *prima facie* case by showing (1) he belongs to a protected class; (2) he was qualified for his job and was performing it satisfactorily; (3) he was nonetheless discharged; and (4) the position remained open to similarly qualified applicants after his discharge. *Id.*, at 1228; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Smith fails the second prong of the test because he admits he was not performing his job satisfactorily. *Karpel, supra.* In addition, Smith has not placed any evidence in the record as to what happened to his job; *i.e.,* that the position remained open and UPS solicited applicants. *Smith v. Budget Rent–A–Car Sys., Inc.*, 164 F.3d 625 (table), 1998 WL 716036 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1123, 143 L.Ed.2d 118 (1999), (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)).

In response to the motion, Smith claims he was discriminated against by disparate disciplinary practices. In order to prove a *prima facie* case, Smith must show (1) he "is a member of a protected class; (2) the prohibited conduct in which [he] engaged was as serious as the misconduct of employees outside the protected class; and (3) the employer imposed harsher disciplinary measures against plaintiff than

against employees outside the protected class." *Carter v. Ball,* 33 F.3d 450, 460 (4th Cir.1994). To support the second prong, Smith claims that Lyda, the white driver on the route for Smith's business, violated UPS policy by delivering packages to Smith for his business without collecting the COD charges. He also cites four white package car drivers who were terminated for dishonesty and later had their terminations reduced to suspensions. These individuals, he claims, received warning letters whereas he was fired immediately. A fifth white driver, Smith claims, was allowed to resign in lieu of termination. Smith also claims that statistical evidence supports his claim because from January 1995 through September 1996, UPS terminated 313 employees in the West Carolina District with 209 of those employees being African American. Of these employees, 18 were terminated for violations of UPS policies and 10 of those were African American. During the same period in the Asheville UPS office, 4 employees were terminated, all of whom were African American.

The Court assumes *arguendo* that Smith has established a *prima facie* case. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993) ("This finding commendably reflects an understanding both of the need to compare only discipline imposed for like offenses in sorting out claims of disparate discipline under Title VII and of the reality that the comparison will never involve precisely the same set of work-related offenses occurring over the same period time and under the same sets of circumstances."). Thus, the burden shifts to UPS to articulate a non-discriminatory reason for the difference in discipline. *Id.* If this is done, the burden shifts back to the Plaintiff to show that the reason is mere pretext and the real reason is discrimination. *Id.* "The plaintiff, however, always bears the ultimate burden of proving that the employer intentionally discriminated against him." *Id.*

■ UPS points out that at the time Smith was confronted with his conduct, he made no accusations or implications of Lyda. Supplemental Affidavit of Marc Weston, filed June 9, 1999, at 1; Ross Affidavit, at 4 ("During my interview with [Smith], Mr. Smith never told me that Mr. Lyda gave him COD packages without collecting the COD funds or otherwise violated Company procedure."). In fact, it was not until discovery was being conducted in this case that Smith made such accusations. Weston Affidavit, *supra*. During the investigation, UPS documents showed that Lyda placed the July 18, 1996, COD package on the conveyor belt destined for will call. *Id.*, at 2. This was consistent with UPS policy and Lyda's delivery records. *Id.* UPS records show the package was never picked up but Smith admitted he took it from the building without paying for it. *Id.* And, in Smith's written statement, he admitted that on other occasions he had taken packages from UPS without paying for them. Moreover, Lyda has not been found to have falsified UPS delivery records or to have violated company policy. *Id.*, at 1. Since at the time Smith was fired, UPS was completely unaware of any allegations against Lyda, its treatment, or lack thereof, of Lyda cannot support an inference of pretext.

■ Smith identifies four white package car drivers whose terminations for dishonesty were later reduced to suspensions. Plaintiff makes no showing that each of these drivers admitted his conduct, as did Smith. Thus, the reductions may have stemmed from further discovery of facts. And, the fact that these employees received warning letters, if indeed they did, is not comparable with Plaintiff's situation since during the first confrontation about his conduct, Smith admitted his violations. Plaintiff has not shown that he was disciplined more severely than white employees who admitted violating COD policies. *Cook*, 988 F.2d at 511; *Carter*, 33 F.3d at 461. As to a fifth white driver, he, like Smith, was offered the option of resigning or being terminated for dishonesty. That driver elected to resign. "Although [each] were involved in the same conduct of [dishonesty], they were also both given the option to resign or be fired for that act. Thus, their discipline was virtually identical." *Tolley v. Health Care & Retirement Corp., Inc.*, 133 F.3d 917 (table), 1998 WL 24972 *3 (4th Cir.1998). The fact that some of these employees were also disciplined for different behavior, such as failing to follow instructions, is also unavailing. And, UPS has identified 10 African American employees who were given the option of resigning in lieu of termination for COD violations. Defendant's Answers to Plaintiff's Interrogatories, No. 17, *attached to* Plaintiff's Response.

■ Nor does the statistical evidence presented by Smith prove pretext. Claiming that the majority of employees discharged during a 21-month period were African American does nothing to advance the claim of pretext in this situation. No information is provided concerning the overall racial composition of the UPS workforce; no information is provided about the reasons for those terminations. Discharging an employee who has admitted dishonesty is different from the discharge of an employee for tardiness, for example. "The usefulness of statistics depends on the surrounding facts and circumstances." *Carter*, 33 F.3d at 456. The fact that more African Americans were terminated than Caucasians is of no moment "without a comparison of the relevant labor pool." *Id.* "Moreover, if a plaintiff offers a statistical comparison without expert testimony as to methodology or relevance to plaintiff's claim, a judge may be justified in excluding the evidence." *Id.*, at 457.

UPS countered with proof that between 1988 and 1998, 19 employees in the West Carolina District resigned in lieu of termination for violating the COD procedures. Ross Affidavit, at 1. Of these, 10 were African American. *Id.* From 1988 through March 2, 1999, 22 UPS employees in the

same district were terminated for violating COD policies. *Id.*, at 2. Of these 22, only 8 were African American. *Id.* As such, UPS is "seldom [a] credible target[ ] for charges of pretextual firing." *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 277 (4th Cir. 1995).

> [In order] to survive a motion for summary judgment . . . the plaintiff must do more than merely raise a jury question about the veracity of the employer's proffered justification. The plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action. . . . [A]n employer is entitled to summary judgment unless the [ ] plaintiff has adduced sufficient evidence *"both* that the reason was false, *and* that [racial] discrimination was the real reason.". . . This approach, dubbed "pretext-plus," is a better approach than "pretext only." Pretext-plus best preserves the character of statutes like [Title VII] as antidiscrimination statutes. . . . [Title VII] "does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of [race]." Of course, the simple fact "[t]hat the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of [race] is correct.". . . "[N]othing in law would permit [a court] to substitute for the required ·finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable."

*Vaughan v. Metrahealth Companies, Inc.*, 145 F.3d 197, 202 (4th Cir.1998) (quoting *St. Mary's*, 509 U.S. at 515, 523–24, 514–15, 113 S.Ct. 2742) (other citations omitted) (emphasis in original). Plaintiff has not carried his burden and this action must be dismissed.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion for summary judgment is hereby **GRANTED.**

A Judgment dismissing this action in its entirety is filed herewith.