# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JENNIFER A. LAUER,

        *Plaintiff-Appellant,*

v.

THE SCHEWEL FURNITURE CO., INC.,

        *Defendant-Appellee.*

No. 03-1043

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, Senior District Judge.
(CA-00-868-7)

Argued: October 29, 2003

Decided: January 5, 2004

Before WILKINS, Chief Judge, and TRAXLER and
DUNCAN, Circuit Judges.

---

Reversed and remanded by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Terry N. Grimes, FRANKLIN COMMONS, Roanoke, Virginia, for Appellant. Alexander Wayne Bell, ALEXANDER BELL, P.L.C., Lynchburg, Virginia, for Appellee. **ON BRIEF:** William F. Schneider, Diane C. Cady, ALEXANDER BELL, P.L.C., Lynchburg, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

Jennifer Lauer appeals from an order of the district court granting judgment as a matter of law, or in the alternative a new trial, to her former employer, Schewel Furniture Company, Inc. ("Schewel"). Because we conclude that Lauer proffered evidence sufficient to permit a reasonable jury to find that she was terminated in retaliation for filing a gender discrimination charge against Schewel, we reverse the order granting judgment as a matter of law and remand this case to the district court for a new trial.

I.

In reviewing the grant of a motion for judgment as a matter of law, we must view the evidence in the light most favorable to Lauer, the nonmovant. *See Anderson v. G.D.C., Inc.*, 281 F.3d 452, 457 (4th Cir. 2002). Accordingly, we recite the evidence presented at trial in this light. However, we note relevant conflicts in the evidence as necessary to the analysis.

A.   *Lynchburg Warehouse*

Lauer was employed with Schewel from May 31, 1999 until she was discharged on July 3, 2000. Lauer began her employment with Schewel as a "warehouse helper" at the company's central warehouse in Lynchburg, Virginia. Lauer worked on the loading dock loading and unloading furniture from trucks. She was the only woman among the 27 employees working at the warehouse.

Lauer experienced difficulties with Stephen Cox, her immediate supervisor at the Lynchburg warehouse. She suffered abuse on a "daily basis" from Cox, who told Lauer that he did not want a woman working for him. Cox insulted and threatened Lauer, and sabotaged

her work. Lauer reported Cox's behavior to the assistant warehouse manager, David Gillespie, and to Linda Metts, Gillespie's immediate supervisor, but her complaints to management generally went unresolved. Ultimately, Lauer spoke with Schewel's human resource manager, Barbara Lee, and demanded that something be done to stop the harassment. Lauer suggested that Lee transfer either Cox or Lauer to another facility. At this time, Lauer also informed Lee that she had contacted the Equal Employment Opportunity Commission by telephone and "was going to file" a sex discrimination charge against the company. (J.A. at 208-210). As a result of her meeting with Lee, Lauer was transferred to the company's retail store in Bedford, Virginia.

### B. *Bedford Store*

Lauer began working at the Bedford store, a small retail store with a showroom and a warehouse, on October 11, 1999. The store employed a total of five warehouse workers, including Lauer, and two sales people. Lauer's duties at the Bedford store included loading and unloading trucks, transporting furniture to the sales floor, loading furniture into customers' vehicles, and delivering furniture to customers' homes. Sandy McManaway managed the Bedford store, and was Lauer's immediate supervisor.

On November 8, 1999, Lauer completed a discrimination complaint questionnaire provided her by the EEOC. In this document, Lauer detailed the events that occurred at the Lynchburg warehouse. On February 14, 2000, Lauer filed a formal charge of discrimination against Schewel, and on February 28, 2000, the EEOC mailed a "Notice of Charge of Discrimination" to Mark Schewel, the president and chief executive officer of the Schewel company.

### C. *Warning Notices*

According to Lauer, her employment took a turn for the worse almost immediately after the company received notice of her discrimination charge. Lauer testified that before she filed her discrimination complaint with the EEOC, McManaway had never criticized her job performance or reprimanded her in any way; however, McManaway issued four "Employee Warning Notices" to Lauer in March and May

of 2000. Specifically, McManaway "wrote up" Lauer for violating company rules on March 13, March 21, May 9, and May 22, 2000. All but one of these notices reprimanded Lauer for spending too much time on the sales floor talking to customers and "interfering with the sales process." The March 13, 2000 warning, for example, stated as follows:

> Continues to hang around sales floor talking with the customers and interrupting sale [*sic*] process. Have had several complaints from sales people. Also handling too much personal business during store hours. It is against company policy for anyone to interrupt the sales process. When you start talking to customers the salesperson loses their attention and has to start over which makes it very difficult to close a sale. STAY off sales floor except to place mdse [*sic*] or load customers. Conduct personal business outside store hours. This must be adheared [*sic*] to immediately. We have discussed this before and this is the last time it is to happen. Also watch language used in and around the store. Had complaint about this also.

(J.A. at 568). At trial, Lauer contended that her signature, which appeared in the space provided for her signature on this employee warning notice, had been forged.

In the May 9, 2000, warning notice, McManaway again reprimanded Lauer for spending too much time on the showroom floor:

> Was on the sales floor again Friday 5-5-00 interfering with customer & salespersons. You have been warned about this several times before & written up on 3/13/00. It is against company policy to interfere with the sales process. It affects the sales of the company. Any infraction of any company policy or rules will result in immediate termination.

(J.A. at 570). Lauer herself signed this warning, but did not agree that she had been "interfering" with customers. In the space provided for her comment in the warning notice, Lauer wrote:

> I do not feel that I am interfering with the customers. If the sales people cannot do their own job then they need to find another job & leave me out of it! Don't ask my advise [*sic*] & then turn me in for interfering.

(*Id.*)

McManaway issued a final written warning to Lauer for interfering with customers on May 22, 2000.

> Insubordination. Hanging out on sales floor talking to customers. You have been advised to stay off sales floor except to sample mdse [*sic*] — Was talking to customer in main ilse [*sic*] of store on Friday 5-19. When I paged you to the whse [*sic*] you ignored me & continued to visit with customer. If you are to continue working here you will have to do as I say. No more talking about it. Stay in the whse [*sic*] and out of the store except to sample. You can do your job without comments or griping. If you cannot do this you will be terminated. This is your last warning. Failure to comply will result in immediate termination.

(J.A. at 571). Lauer refused to sign this warning notice on the grounds that the accusations against her were false.

### D. *Termination*

The incident that ultimately led to Lauer's termination occurred on Friday, June 30, 2000 when Lynne Barrett, the credit manager of the Bedford store, reported to McManaway that Lauer was rude to customers Jon Willdigg and Kathy McElroy (the "Willdiggs") during the close of a furniture sale. Barrett prepared the following incident report:

> Lynne Barrett was working on a "new" customers contract Jon Willdigg (excellant) [*sic*]. Last customer of the day. Jennie enter [*sic*] credit office & said she wanted the delivery ticket to fabricate the furniture the customer asked her how soon are you going to deliver & Jenni [*sic*] said in

about 10 min as soon as we spray it & *throw it* on the truck! The customer asked if he had time to pick up Chinese take-out and Jennie replied (No!, The men are going to be mad as it is because they were suppose [*sic*] to get off at 7:00 o'clock — we close at 7:00. We'll be straight to your house.

Very awkward. I apologized to the customer for the rudeness & assured them we were very pleased to have their business.

(J.A. at 644) (emphasis in original).

Lauer delivered the furniture to the Willdiggs' home later that evening. At some point over the weekend, Lauer happened to see the couple dining at a local restaurant. Lauer testified that she greeted the couple and apologized to them "if there was any inconvenience when we came to the house or at the store[.]"

On the following Monday, July 3, 2003, McManaway and her immediate supervisor, David Lynch, decided to terminate Lauer's employment. McManaway prepared an "Employee Separation Record," and in this document explained the basis for Lauer's termination:

Continuous Rules Infraction. Was repeatedly asked to stay in the warehouse unless called to load a customer or sample [merchandise]. Jenni was asked not to interfere in the processing of customers. She came into the credit office and asked for a delivery copy & engaged in conversation with the customer after being told not to.

(J.A. at 643).

At trial, McManaway testified that she attached Barrett's June 30 incident report to the employee termination record and presented the entire document to Lauer when McManaway, Lauer, and Lynch met to discuss the incident. According to McManaway, she informed Lauer that her employment had been terminated "because she continued to interfere in the sales." Lauer disputes this. According to Lauer,

on July 3 she was given only a copy of Barrett's incident report documenting her "rudeness" to the Willdiggs. Lauer testified that Barrett's report "stated that I was rude to a customer, and it was Mr. Willdigg and Ms. McElroy, and the reason they were firing me was for being rude to a customer. They didn't say anything about any warnings, nothing. It was because I was rude." (J.A. at 154).

After her meeting with McManaway and Lynch, Lauer left the store and went to the Willdiggs' home. Lauer told the Willdiggs that she had lost her job at Schewel because the company believed that Lauer had been rude to them. The Willdiggs recounted the details of this encounter in a letter to Lauer's trial counsel.

> [T]he woman who delivered our furniture (she introduced herself as Jenny) came to our house and stated that she had been fired because of us. We had no idea what she was talking about. She explained that she had been "fired for being rude to us." We told her that we didn't know what she was talking about. We were concerned, not knowing what was going on, so my husband left to go to Schewel's to see what he could find out while I stayed home to talk to Jenny.

> At the store, my husband talked to the manager. He told her that he understood that there was some problem with Jenny that involved us. He stated that we didn't appreciate being used as an excuse to fire someone when we didn't have any complaints about them.

> The manager stated that she had been told by another worker in the store that Jenny had been rude to us. When my husband denied this, the manager continued that this wasn't the first time something like this had happened with Jenny and that she had been reprimanded before for having unnecessary contact with the customers.

> . . .

> My husband stated again that we had not perceived Jenny as rude and that it was his opinion that if the store wanted

to fire someone, the company needed to come up with it's own reasons instead of putting the blame on us.

(J.A. at 603). McManaway documented her confrontation with Mr. Willdigg and added her notes to the employment termination record.

### E. *Trial Court Proceedings*

Lauer received a right-to-sue notice from the EEOC on August 25, 2000, and subsequently filed a complaint in the district court against Schewel on November 8, 2000. Lauer's complaint asserted claims against Schewel for sexual harassment and discriminatory retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Specifically, Lauer alleged that Schewel unlawfully permitted a hostile work environment to exist at the Lynchburg warehouse, and that Schewel retaliated against her after she filed a sex discrimination complaint with the EEOC by disciplining her and ultimately terminating her.

At the close of discovery, Schewel moved for summary judgment, which the trial court denied on the grounds that a genuine factual dispute regarding Lauer's claims of harassment and retaliation precluded summary judgment. The case was tried to a jury, and at the close of Lauer's evidence, Schewel moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. The trial court took this motion under advisement.

Subsequently, the jury returned a special verdict, finding that Lauer was subjected to unwelcome conduct at Schewel, but concluded that this conduct was not based on her gender. The jury, however, found in Lauer's favor on her claim of retaliatory discharge, and awarded her $20,000.00 in compensatory damages. After trial, Schewel renewed its motion for judgment as a matter of law. In the alternative, Schewel's motion urged the court to grant a new trial. The district court first granted the motion for judgment as a matter of law, holding that even if Lauer successfully established a *prima facie* case of discriminatory retaliation, Lauer failed to adduce any evidence to prove that Schewel's articulated reason for Lauer's firing was pretextual. Second, the trial judge ruled that a new trial would be appropriate if

its order granting judgment as a matter of law to Schewel was reversed on appeal. This appeal followed.

## II.

Preliminarily, we address one issue before turning to the merits of Lauer's appeal. Schewel asserts that notwithstanding the sufficiency of the evidence presented at trial, it is entitled to judgment as a matter of law because Lauer failed to obtain a right-to-sue letter from the EEOC on her retaliatory discharge claim. As a result, Schewel argues that Lauer has failed to exhaust her administrative remedies. This argument is without merit. We have previously held that a retaliation claim relates back to the original charge of discrimination, such that "a plaintiff may raise the retaliation claim for the first time in federal court." *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992). Under these circumstances, Lauer was not required to file a retaliation charge with the EEOC.

## III.

### A.   *Judgment as a Matter of Law*

Lauer contends that the district court erred in granting Schewel's motion for judgment as a matter of law on her Title VII retaliation claim.\* We review the district court's order granting judgment as a matter of law to Schewel *de novo*. *Corti v. Storage Tech. Corp.*, 304 F.3d 336, 341 (4th Cir. 2002). Under Rule 50, judgment as a matter of law is appropriate only where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue[.]" Fed. R. Civ. P. 50(a)(1).

---

\*Lauer also appeals the trial court's refusal to submit an instruction to the jury on the issue of punitive damages. Lauer points to no evidence, however, that would allow a jury to reasonably conclude that Schewel discriminated against her "with malice or with reckless indifference to [her] federally protected rights[.]" *Anderson*, 281 F.3d at 459 (citation omitted). Accordingly, the refusal to submit a punitive damages instruction to the jury was not an abuse of discretion.

In determining whether the evidence in this case is sufficient to support the jury's verdict, we view the evidence in the light most favorable to Lauer, giving her the benefit of all reasonable inferences. "If, with that evidence, a reasonable jury could return a verdict in favor of [Lauer], the court must defer to the judgment of the jury, even if the court's judgment on the evidence differs." *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991). A "reasonable" jury finding is one that rests on proffered evidence, rather than "sheer speculation." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 242 (4th Cir. 1982).

In order to prevail in her action under Title VII, Lauer had to meet her burden of proof under the three-stage proof scheme established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). We have previously held that the *McDonnell Douglas* burden-shifting framework is applicable to retaliation claims. *See Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998). Under *McDonnell Douglas*, Lauer first had to prove, by a preponderance of the evidence, a *prima facie* case of discriminatory retaliation. This required her to show (1) that she engaged in a protected activity under Title VII, (2) that Schewel took an adverse employment action against her, and (3) that there was a causal connection between the protected activity and the adverse action taken against her. *See Anderson*, 281 F.3d at 458.

We believe that Lauer successfully established a *prima facie* case of discriminatory retaliation. It is undisputed that Lauer's filing of a complaint with the EEOC was protected activity under Title VII, and that her termination was an adverse employment action. With regard to the causation requirement, the evidence, when viewed in the light most favorable to Lauer, showed that after the EEOC sent notice of Lauer's discrimination complaint to Schewel on February 28, 2000, the company issued a string of written reprimands to Lauer on March 13, March 21, May 9, and May 22, 2000, and ultimately terminated her employment on July 3, 2000. We conclude that the evidence of a temporal sequence leading to her discharge was sufficient to establish that Lauer was terminated in retaliation for filing a charge of gender discrimination against Schewel.

Schewel, however, articulated a legitimate, non-retaliatory reason for terminating Lauer's employment: Lauer spent too much time on

the sales floor interacting with customers and "interfering" with the sales process. Consequently, Lauer must demonstrate that Schewel's explanation was merely a "pretext" for a retaliatory action. To establish pretext, a plaintiff must show that the employer's otherwise legitimate explanation for the adverse employment action was "unworthy of credence," and therefore a "coverup" for unlawful discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *McDonnell Douglas*, 411 U.S. at 805.

There was evidence at trial that permitted the jury to reasonably reject Schewel's explanation for Lauer's termination as pretext. First, we have previously observed that contradictions between an employer's proffered explanation for the adverse employment action and the employer's contemporaneous statements to the employee are convincing evidence of pretext. *See Alvarado v. Bd. of Trs. of Montgomery Comm. Coll.*, 928 F.2d 118, 122-23 (4th Cir. 1991). In *Alvarado*, the plaintiff established pretext by showing that the employer's explanation at trial for the termination (poor work performance) contradicted the explanation the plaintiff was given at the time he was fired (lack of available work). (*Id.* at 123).

In this case, Lauer put on evidence that in her meeting with McManaway and Lynch on July 3, 2003, Lauer was told that "the reason they were firing [her] was for being rude to a customer." (J.A. at 154). According to Lauer, "[t]hey didn't say anything about warnings, nothing. It was because [she] was rude." (*Id.*) Similarly, Mr. Willdigg testified at trial that "I asked [McManaway] why Jennifer had been fired. I said we filed no complaint. And she told us that [Lauer] had been rude to us." (J.A. at 238). The contradiction between this explanation and the explanation offered at trial — that is, that Lauer had once again "interfered" with the sales process — is evidence on which a jury could reasonably infer that Schewel's articulated reason for terminating Lauer was not worthy of credence.

Second, McManaway claimed that her concerns regarding Lauer's habit of "interfering" with customers on the showroom floor were founded on complaints from her salespeople. Specifically, McManaway testified that Teresa Tolliver and Frenchie Hudson complained to her about Lauer interfering with their sales. At trial, however, Hudson denied this.

Q:   Did [Lauer] ever interfere with your sales in any way?

A:   No, sir, not with mine, huh-uh.

(J.A. at 469). Hudson further testified that she had never seen Lauer interrupt or interfere with *any salesperson* while dealing with a customer.

Q:   Were you a salesperson there?

A:   Yes, sir.

Q:   Did you ever observe Ms. Lauer interfere with any sales of anybody else in the store?

A:   No, sir.

(*Id.*)

Third, Lauer put on evidence from which the jury could have reasonably concluded that McManaway was forced by her superiors to "write up" Lauer in retaliation for the complaint she filed with the EEOC. At trial she testified:

Q:   All right. Ms. Lauer, did Ms. McManaway tell you anything about why she had to generate these documents?

A:   She told me that if she did not that she would lose her job. She kept apologizing. She would talk to me off the premises and cry about it or back in the warehouse, and she would cry. And she used to tell me all the time, I apologize, but if I don't do it, I'm going to lose my job.

(J.A. at 149). The trial court declined to view Lauer's testimony as evidence that the company demonstrated a retaliatory animus against her on the reasoning that the apologies to Lauer were probably nothing more than a "just-doing-my-job" disclaimer. (J.A. at 661). However, the resolution of a factual issue such as the actual motivation behind McManaway's apologies was a jury function, and the jury

could have reasonably inferred from this evidence that any concern about "interfering" with customers was a pretext for the company's decision to fire Lauer in retaliation for filing a discrimination complaint with the EEOC.

Finally, despite McManaway's repeated references in the employee warning notices to a "company policy" against interfering with customers on the showroom floor, both McManaway and Barbara Lee admitted that there was, in fact, no written policy at Schewel against "interfering" with customers. (J.A. at 351, 458). On the basis of this evidence, the jury could have reasonably concluded that Schewel had not really terminated Lauer for "interfering" with customers and the sales process. As a result, Lauer proffered sufficient evidence of pretext to support the jury's verdict in her favor on the retaliation claim, and the district court's order setting aside the jury verdict and granting judgment as a matter of law to Schewel was erroneous.

## B. *New Trial*

In contrast to our review of the trial court's motion granting judgment as a matter of law, "[t]he grant or denial of a motion for new trial is entrusted to the sound discretion of the district court and will be reversed on appeal only upon a showing of abuse of discretion." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998). This deferential standard of review requires us to "give the benefit of every doubt to the judgment of the trial judge[.]" (*Id.*) (internal quotes omitted).

The district court, when considering a motion for new trial, "may weigh the evidence and consider the credibility of the witnesses." *Wyatt v. Interstate & Ocean Transp. Co.*, 623 F.2d 888, 891 (4th Cir. 1980). In addition,

> a trial judge has a duty to set aside a verdict and grant a new trial even though it is supported by substantial evidence, if he is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false or will result in a miscarriage of justice[.]

(*Id.* at 891-92) (internal quotes and citation omitted). Having reviewed the record and the parties' appellate briefs, we find no abuse of discretion in the trial judge's alternative order granting a new trial to Schewel. Accordingly, we remand this case to the district court for a new trial.

*REVERSED AND REMANDED*