**Frederick G. SCHAMANN,**

v.

**Sean O'KEEFE, Administrator, National Aeronautics and Space Administration**

**No. CIV.RDB 03–0974.**

United States District Court, D. Maryland, Northern Division.

April 21, 2004.

Lawrence J Sherman, Law Offices of Lawrence J Sherman PC, Washington, DC, for Frederick G. Schamann, Plaintiff.

Larry D Adams, Office of the United States Attorney, Baltimore, MD, for Sean O'Keefe, Administrator, Defendant.

## MEMORANDUM OPINION

BENNETT, District Judge.

Plaintiff, Frederick G. Schamann ("Schamann"), has brought the instant action alleging that his employer, the National Aeronautics and Space Administration ("NASA"), discriminated and retaliated against him on the basis of his race, sex, age, and legally-protected activities, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, *et. seq.* ("ADEA").[1] Specifically,

---

1. The named Defendant, Sean O'Keefe, is NASA's Administrator. A lawsuit alleging employment discrimination against a federal employee must be brought against "the head of the department, agency, or unit" in which the discrimination is alleged to have taken place. 42 U.S.C. § 2000e–16(c).

Plaintiff contends that NASA refused to promote him to the GS–14 level and subjected him to a pattern of adverse treatment and harassment in response to his filing of EEO complaints. Defendant has moved to dismiss Plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The issues have been fully briefed by the parties, and oral argument is not necessary. *See* Local Rule 105.6 (D.Md.2001). For the reasons that follow, the Court will grant the Defendant's Motion for Summary Judgment.

## BACKGROUND

Schamann is a sixty-three year old Caucasian male employed as a GS–13 Computer Engineer at the NASA Goddard Space Flight Center ("GSFC") in the Science Communications Technology Branch ("SCTB"),[1] Space Data and Computing Division, Earth Sciences Directorate. He has worked for GSFC since 1967, his entire professional career, and is, based upon his performance reviews, an employee who has consistently met or exceeded expectations. Between 1996 and 2000, he received Special Act Awards annually in the amounts of $350, $601, $750, $1,000, and $1,300, respectively. In 1999, GSFC awarded Schamann a National Resources Medal, a prestigious award given to only one other individual that year.

In 1996, two years after Schamann was transferred to SCTB, he was assigned to work on a program called Project Earth Alert ("EAP"). Under Schamann's direction, the program expanded and gained official recognition pursuant to a Memorandum of Understanding ("MOU") entered into between NASA and the Federal Emergency Management Agency ("FEMA"). Schamann administered the MOU and served as the Project Manager and Contracting Officer's Technical Representative ("COTR") for the EAP.

In December 1997, Schamann filed a union grievance challenging his reassignment from SCTB to a GS–13 Computer Engineer position in the Applied Engineering and Technology Directorate, Advanced Data Management and Analysis Branch. Schamann alleged that the transfer was the product of age discrimination and violated the collective bargaining agreement and demanded a promotion, back pay, and reassignment to SCTB. The Agency found that the transfer was not discriminatory but returned Schamann to SCTB on March 9, 1998, because "no synergy" existed between Schamann's position and the new organization.

In April 1998, Schamann was assigned to a Position Description ("PD") that reflected his duties in connection with the EAP. The PD classified Schamann's position at the GS–13 level with no career ladder promotion potential above GS–13.

Between 1998 and 2001, the EAP expanded in its scope, complexity, and budget. In 2001, the project received a Tibbets Award, which is jointly awarded by the Small Business Administration, Congress, and the President to recognize outstanding technology applications that create jobs in the private sector. In 2000 and 2001, Schamann solicited the assistance of his first-level supervisor, Acting SCTB Branch Head Jerome Bennett, in securing a promotion to level GS–14 based on an accretion of duties. When Bennett did not advance Schamann for promotion, Schamann sought to apply pressure to GSFC management to achieve that goal. At a

---

**1.** Defendant has inaccurately referred to Schamann's branch as the Computer Net- works and Communications Branch.

meeting with Bennett in May 2001, Schamann stated that "[b]ased upon my experience in the union, I know if I put enough pressure on Management by filing continuous EEO complaints or grievances, they will eventually make me a settlement offer to let me retire with a high three at the GS–14 level."[2] Bennett Aff., Def. Ex. 17, ¶ 7. After the meeting, Schamann accused Bennett of discriminating against him because he was close to retirement. Schamann Dep., Def. Ex. 9 at 198. On July 3, 2001, Schamann sent Bennett a letter reiterating his request for an accretion promotion and expressing frustration over Bennett's "idle promises." On July 23, 2001, Schamann met with his second-level supervisor, Dr. Dorothy Zukor, Deputy Director of the Space Data and Computing Division and a representative on the GSFC Diversity Council. Schamann hand-delivered a letter claiming that his non-promotion to GS–14 was the product of discriminatory and retaliatory[3] animus and requesting promotion to GS–14/15 retroactive for three years and back pay at the GS–14 and GS–15 levels.

Schamann's account and Zukor's account of what transpired at the meeting differ. Schamann contends that Zukor acknowledged the existence of an informal quota for the promotion of females and minorities to GS–14 and GS–15 positions at GSFC based upon the Agency's diversity policy. Schamann further contends that Zukor acknowledged that he had done an outstanding job and deserved promotion to GS–14. Zukor denies making those statements. In any event, Zukor discussed Schamann's promotion with the Director of the Earth Sciences Directorate, Dr. Franco Einaudi. Einaudi indicated that he did not support Schamann's immediate promotion. Zukor reported this information to Schamann and suggested that he publish scientific papers, attend conferences, and take other steps to increase his promotion potential.

As the result of the denial, Schamann filed an informal EEO complaint on August 6, 2001 alleging discrimination on the basis of age, race, and sex. The parties agreed to mediate the dispute with the assistance of a neutral from the Federal Mediation and Conciliation Service, Herbert Fishgold, Esquire. Fishgold met with the parties in an attempt to develop a consensus Position Description that accurately reflected the duties that Schamann had accreted since his 1998 PD and to properly classify the position. On January 7, 2002, Fishgold issued his Report and Recommendations recommending adoption of the proposed PD and grading at the GS–14 level. The Agency refused to accept the findings and recommendations.

In October 2001, while mediation was pending, Bennett provided Schamann with a draft of his annual performance appraisal for the period October 1, 2000 to September 30, 2001. Bennett graded Schamann as "meets expectations," but did not recommend him for a cash award. Schamann objected to language in the narrative portion of the appraisal that he felt suggested that he had engaged in illegal lobbying activities with or on behalf of the EAP's contractor. On December 19, 2001, Bennett provided Schamann with a revised performance appraisal that substituted language that stated that the "strategies . . . used by . . . Schamann among his government peers have resulted in additional

---

**2.** As far as the Court can ascertain from the record before it, Plaintiff does not dispute making this statement.

**3.** Although Schamann refers to his reassignment to the Advanced Data Management and Analysis Branch in his Amended Complaint and Opposition, the Court finds that the matter was fully resolved and that it is not a predicate to the instant action.

funds being directed to the project." Schamann advised Bennett that the revised language increased, rather than mitigated, his concerns that he might be subject to administrative or criminal action based on illegal lobbying activities. Rather than work with Bennett to revise the language a second time, Schamann demanded review by Zukor.

On May 6, 2002, Earth Sciences Director Einaudi sent an e-mail reminding all directorate employees that it was illegal to lobby Congress on behalf of NASA projects or to cause contractors to do so. Schamann interpreted the e-mail as being prompted by the language in his performance appraisal and filed an EEO complaint alleging that GSFC retaliated against him by placing inappropriate language in the narrative that led to the warning and no performance award for the 2001 performance period.

On June 27, 2002, investigators from the Office of the Inspector General from NASA and the Department of Defense interviewed Schamann in response to an anonymous tip that an employee of the contractor Schamann supervised (AEP-TEC) was a registered lobbyist at times when he made time charges to Schamann's contract. Although Schamann was not the target of the investigation, he concluded that his supervisors falsely reported to OIG that he had condoned or participated in illegal lobbying activities by the contractor in retaliation for the exercise of his EEO rights. Consequently, on August 29, 2002, he filed an EEO complaint alleging that GSFC retaliated against him by causing the investigation. On October 15, 2002, GSFC issued a final agency decision sustaining the dismissal of the complaint for failure to state a claim. Schamann's

appeal of the decision to the EEOC was subsequently denied, rendering the claim ripe for consolidation in this lawsuit.[4]

On November 15, 2002, the Office of Human Resources (OHR) at GSFC issued a new, updated Position Description to replace Schamann's 1998 PD. The 2002 PD gave Schamann credit for duties and responsibilities he had assumed during the intervening period. However, the position remained graded as a level GS–13, with no career ladder promotion potential. Schamann filed an EEO complaint on January 7, 2003 alleging that the redrafting of his PD was retaliatory, conducted without his input, and diminished his promotion potential.

The latter administrative complaint was consolidated with another complaint filed on December 12, 2002 alleging retaliation in that on October 15, 2002, Schamann was denied travel expenses to attend the International Japanese U.S. Technology Applications Conference in Hawaii. In February and April 2003, Schamann filed union grievances alleging acts of retaliation by GSFC's Chief Counsel. The first grievance alleges that Chief Counsel "improperly edited a corporate press release . . . so as to bolster the Office of Chief Counsel's position in my ongoing EEO case . . . ." The second grievance alleges that the Office of Chief Counsel "sought to influence the reviewing official by manufacturing false evidence to be used in an ongoing EEO case and to justify denying bonuses, rating to protect against a RIF, etc." Schamann has not pursued the grievance claims in the context of this lawsuit.

Schamann's December 19, 2001 and May 6, 2002 complaints were consolidated and scheduled for a hearing before an EEOC

---

**4.** Because exhaustion is not required for retaliatory acts that grow out of an earlier administrative complaint, *see Riley v. Technical and Mgmt. Servs. Corp.*, 872 F.Supp. 1454, 1459–60 (D.Md.1995), Plaintiff may, and properly has, raised the reprisal allegations contained in his additional EEO complaints in the pending action.

Administrative Judge. In anticipation of that hearing, the parties engaged in discovery, including Schamann's deposition. On April 8, 2003, the Administrative Judge dismissed the complaints without prejudice because Schamann had filed suit in this Court on April 3, 2003.

On May 8, 2003, Schamann received the results of an additional, independent review of his position classification. During the period October 1, 2002 through July 10, 2003, the Director of the Applied Engineering and Technology Directorate, Arthur Obenschain, undertook a promotion review of all non-African-American scientists and engineers at GSFC in grades GS–13 and GS–14 who had eight years or more time-in-grade. The review flowed from the Agency's settlement of a class action filed by African–American scientists and engineers at GSFC. Schamann was one of 462 employees reviewed for promotion using fixed criteria developed by the Office of Human Resources. Schamann's supervisors submitted an evaluation of him based on those criteria which concluded that he did not meet all of the standards for promotion. Schamann contacted Obenschain directly to request a careful review of his position and submitted documents in rebuttal to the supervisors' evaluations. Obenschain determined that Schamann met criteria not identified as satisfied by his supervisors, but noted "significant shortfalls ..., any of which would not permit an accretion promotion." Obenschain Aff., Def. Ex. 40 at 2. Of particular note, Obenschain rebutted Schamann's claim that a change in duties alone merits an accretion promotion:

> An accretion promotion is provided specifically for those individuals who have raised the level of their job; that is, such promotions are awarded due to a person's impact on the job, not because the duties have changed. The promotion criteria are applied without regard for the particular position description an employee holds.

Def. Ex. 40, ¶ 11. On July 9, 2003, Schamann filed an EEO complaint challenging Obenschain's decision that he was not qualified for an accretion promotion.

The First Amended Complaint contains four counts. Counts I, II, and III allege race, sex, and age discrimination in violation of Title VII and the ADEA based on GSFC's consistent failure to promote Schamann to GS–14 and higher for accretion of duties. Count IV alleges retaliation in violation of both statutes based on the Agency's failure to promote Schamann, denial of a performance award for fiscal year 2001, and inclusion of narrative comments in Schamann's performance evaluations "that subject plaintiff to potential disciplinary and/or criminal action by falsely stating or implying that Mr. Schamann has engaged in lobbying activities," Am. Compl. ¶ 36.

### STANDARD OF REVIEW

Because the parties rely extensively upon affidavits and other documents outside of the pleadings, this Court will treat Defendant's motion as one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Fed. R.Civ.P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...."). Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "When the moving party has met its responsibility of

identifying the basis for its motion, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir.1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(e)).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that, in considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant submission of the matter to a jury for resolution at trial. In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, only "facts that might affect the outcome of the suit under the governing law" are material. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, Rule 56 mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Id.* at 249–50, 106 S.Ct. 2548. District courts have an "affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex Corp.*, 477 U.S. at 323–24, 106 S.Ct. 2548).

## DISCUSSION

### I. Plaintiff's Disparate Treatment Claims

The gravamen of Schamann's Title VII and ADEA disparate treatment claims in Counts I through IV of the Complaint is that he has been denied promotion to GS–14 based upon his race, gender, and age. Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... [or] sex." 42 U.S.C. § 2000e–2(a)(1). The ADEA similarly forbids "an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age [i.e., individuals who are 40 years or older at the time of the alleged adverse action]." 29 U.S.C.A. §§ 623(a)(1), 631(a).

Generally speaking, a plaintiff may avert summary judgment and establish a claim of intentional discrimination using "ordinary principles of proof by any direct or indirect evidence relevant to and sufficiently probative of the issue." *EEOC v. Western Elec. Co., Inc.*, 713 F.2d 1011, 1014 (4th Cir.1983). Alternatively, the plaintiff may proceed under the proof scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny, under which the employee, after establishing a *prima facie* case of discrimination, must demonstrate that the employer's proffered nondiscriminatory reason for the challenged employment action is in fact a pretext for discrimination. *Id.* The Court will analyze the evidence under both standards.

## A. *Direct Evidence of Discrimination*

■ Schamann claims that his non-promotion claims are supported by direct evidence of discrimination in the form of statements by GSFC management officials. Schamann contends that his second-level supervisor, Dorothy Zukor, at a meeting on July 23, 2001 at which Schamann charged the agency with discrimination, acknowledged that GSFC's diversity policies linked diversity goals and promotion points and limited the number of "billets" (slots) available for promotion. Schamann interprets Zukor's statements as a admission "that the GSFC promotion system was structured in a manner that precluded [P]laintiff from being promoted based on his racial and gender profile." Opp. Mem. at 16; *see also* ROI, Def. Ex. 3 at Exs. 2A, 2F. Zukor acknowledges that the meeting took place but claims that Schamann misrepresents the substance of her comments. Zukor Aff., Def. Ex. 15. Specifically, Zukor states that:

> Mr. Schamann's belief that I agreed with his claim that promotions were the "product of discriminatory and retaliatory animus" is incorrect. In our meeting, I listened to Mr. Schamann describe his work and accomplishments. Contrary to his recollection, I did not tell him that he had done an outstanding job; however, I did tell him that I would raise his name for consideration by the Director, Dr. Einaudi, who is the promotion approval authority. I specifically told Mr. Schamann that promotions to GS–14 and GS–15 were very limited. At no time did I concur with his statement that "diversity policies tied together promotion points and 'billets.'" Furthermore, his allegation that he has not been promoted "because it would run contrary to the agency's unofficial policy of granting preference to minority and female employees targeted for promotion"

is false. Mr. Schamann has not been recommended for promotion because his Branch Head and Division Chief have not recommended him for promotion. Based on my independent assessment, I also do not believe that Mr. Schamann merits promotion given the limited number of promotions and the large number of candidates whose promotion credentials are more competitive than his.

*Id.* at 3–4.

Schamann's argument that the competing affidavits are sufficient to raise a genuine issue of material fact is wholly undermined by the lack of evidence of any nexus between the continued classification of Schamann's position as a GS–13 and any affirmative action plan. *See Cerrato v. San Francisco Community College Dist.,* 26 F.3d 968, 976 (9th Cir.1994) ("[T]he mere fact of an affirmative action plan's existence is not relevant to proving discrimination unless the employer acted pursuant to the plan."). In fact, the data submitted by Defendant shows that, between January 1, 1998 and July 11, 2003, four Computer Engineers within the Earth Sciences Directorate received accretion promotions to GS–14. Def. Ex. 15 at 4. Of that number, all four are male, three are Caucasian,[5] and three of the four were over forty years old. *Id.* No Computer Engineers within Schamann's branch were promoted by accretion. *Id.* On this evidence, no reasonable jury could find that Plaintiff's non-promotion was the result of the Agency's diversity policies. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505.

■ Schamann next argues that GSFC management "[b]y word and deed ... made clear its unwillingness to promote [him] given his eligibility for retirement based on the combination of age and years of service." Opp. Mem. at 17. Spe-

---

5. The fourth employee is Asian.

cifically, Schamann contends that his first-level supervisor, Jerome Bennett, "made several explicit references to Schamann's retirement eligibility" during promotion discussions in 2001. *Id.* The Court has no information before it describing when such conversations occurred or what Bennett allegedly said about Plaintiff's eligibility for retirement. Assuming that something sinister could be inferred from the alleged "references," Schamann has not established a causal connection between Bennett's comments and the Agency's decision not to reclassify his position as a GS–14. Bennett was not the person responsible for Plaintiff's 2002 Position Description. Rather, the PD was prepared by Christina Reed. Moreover, the Director of the Earth Sciences Directorate, Einaudi, is the final decision-maker with respect to promotions. The Court therefore finds Plaintiff has not offered evidence of age discrimination by reference to Bennett's comments. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d at 291 ("Regarding adverse employment actions, an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision.").

Because Schamann has not provided the Court with direct evidence of discrimination, the Court proceeds to analyze the evidence under the proof scheme adopted in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

### B. *Indirect Evidence of Discrimination under McDonnell Douglas Corp. v. Green*

In *McDonnell Douglas Corp.,* the Supreme Court articulated an "allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory treatment cases." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The *McDonnell Douglas* framework has been adopted for ADEA cases. *See Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 239 (4th Cir.1982). Preliminarily, Schamann must establish a *prima facie* case of discrimination, which requires him to prove "a set of facts which would enable the factfinder to conclude with reasonable probability that *in the absence of any further explanation,* the adverse employment action was the product of [race] discrimination [or retaliation]." *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1315 (4th Cir.1993) (emphasis in original). If Schamann meets this burden, an inference of discrimination arises that may be rebutted by the Agency's showing of a legitimate, non-discriminatory reason for the adverse employment action. *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the Agency meets this burden, the presumption of discrimination is eliminated, and Schamann must prove by a preponderance of the evidence that the Agency's proffered reason for the adverse employment action is pretextual and that the adverse employment action was actually taken because of Schamann's race, sex, or age. *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742. That burden "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

#### 1. *Prima Facie Case*

■ To establish a *prima facie* case of failure to promote, Schamann must prove that: (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994). Defendant does not dispute that Scham-

ann, as a Caucasian male over the age of forty, is a member of several protected classes. Def. Mem. at 33. Defendant similarly does not dispute that Schamann requested promotion to GS–14 on repeated occasions, and that he was denied such promotion. *Id.* at 33–34. Rather, Defendant contends that Schamann was not qualified for an accretion promotion and that, in any event, discrimination played no part in the decision to maintain Schamann's position as a GS–13.

### a. *Plaintiff's Qualification for Promotion*

■  Plaintiff's contention that he qualified for promotion to GS–14 is predicated upon his own assessment of his duties and responsibilities and bolstered by the decision of the mediator, Herbert Fishgold, Esquire, at the conclusion of mediation on Plaintiff's EEO complaints. Schamann's own opinions and conclusory allegations alone do not have sufficient "probative force to reflect a genuine issue of material fact." *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir.1988); *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 960 (4th Cir.1996). Defendant contends that Schamann's assessment of his responsibilities is irrelevant, because an employee's Position Description reflects the duties that a supervisor assigns to an employee, not what the employee elects to do. Reed Aff. at 3, Def. Ex. 16.

In October 2001, Schamann and GSFC management officials agreed to participate in mediation in an attempt to resolve Schamann's August 8, 2001 EEO complaint. The parties agreed to an objective position classification evaluation by a neutral member of the Federal Mediation and Conciliation Service, Herbert Fishgold, Esquire, the purpose of which was to render an advisory opinion as to the proper grade and classification for Schamann's position. The parties agreed only to "consider using the recommendations put forth by the neutral as a basis to resolve the EEO complaint." Def. Ex. 14. Thus, the mediator's recommendations were not binding on either side.

The parties met on November 19 and December 6, 2001 to develop a revised Position Description. Pl.Ex. 6. Some duties and responsibilities listed by Schamann in the PD were subject to verification by the Agency prior to inclusion in any final PD. *Id.* Schamann's expert, David Knudsen, submitted a Position Classification Evaluation Statement based on the proposed PD, which assumed that the duties and responsibilities in question would be retained. *Id.* Knudsen evaluated the position by reference to the Administrative Analysis Grade Evaluation Guide issued by the U.S. Office of Personnel Management and the Primary Standard for the Factor Evaluation System and recommended classification at GS–14. *See id.*

On January 7, 2002, Fishgold issued his Report and Recommendations classifying the position identified in the December 6, 2001 PD as GS–14. Pl.Ex. 6. Fishgold's report relied upon and adopted the Position Classification Evaluation Statement prepared by Knudsen. *Id.* The Agency refused to accept Fishgold's recommendation, in part because Jerome Bennett was unable to verify that Schamann actually performed the new duties included in the December 6 PD. For example, the PD included the following language: "The incumbent ... is directly responsible for coordinating and working closely with NASA HQ Program Offices in the Earth Science Enterprise in formulating and implementing the Natural/Man–Made Hazards Mitigation Program." Pl.Ex. 6 at 45. Correspondence from Earnest Paylor, former HQ Program Manager for the Solid Earth and Natural Hazards Programs and Program Director for the Pacific Disaster Center, later confirmed that Schamann had overstated his responsibility:

So, the statement you quoted below is a bit misleading. Fred is not "... directly responsible for coordinating ... formulating and implementing the ... program[.]"[ ] Also, from the GSFC perspective, he is only one of many people involved with providing input to program planning process. In fact, code 921 has many people that have been more intimately involved in the planning process.

Def. Ex. 3A at Ex. 3B, p. 371. In fact, only one of three individuals Bennett contacted validated Schamann's claims in the PD. *See* Def. Ex. 3A at Ex. 3B, p. 369.

Following the issuance of the Fishgold report, the Agency voiced its objections to Fishgold's qualifications, independence, and methods. Specifically, the Agency noted that Fishgold lacked a technical or engineering background, was not a Classification Specialist, did not address the quality of Schamann's performance, and did not compare Schamann's performance to that of any other employee. Def. Ex. 15 at 4; Def. Ex. 3A at Ex. 3A, p. 365; Def. Mem. at 36–37.

The GSFC Office of Human Resources ("OHR") subsequently performed a classification review based upon the proposed revised PD and determined that the position required a GS–13 grade. Def. Ex. 3A at Ex. 3A, p. 365. The new PD dated November 15, 2002 recognized new responsibilities that had not been adequately described and credited in Schamann's 1998 PD. Def. Ex. 16 at 2. Nevertheless, Schamann remained in his organization, position, classification, title, series, and grade. *Id.* at 1. Additionally, there was no change in his promotion potential. *Id.* OHR's determination is consistent with the positions of Plaintiff's supervisors that Plaintiff was unqualified for an accretion promotion. *See, e.g.*, Bennett Aff., Def. Ex. 17 at 3–4 (stating that he has not recommended Schamann for promotion because "he is not working over and beyond what is required of a GS–13," because all of Schamann's duties relate to EAP, and the administrative and technical oversight of this program does not require the full-time commitment of a civil servant's time," and because Schamann "has been unwilling to take on additional duties to increase his visibility, broaden his responsibilities, and thereby enhance his promotion potential"); Zukor Aff., Def. Ex. 15 at 2–3 (opining that "the complexity and skill required to perform [Schamann's] duties, and his productivity, are not at the level that I expect for someone seeking a promotion to GS–14"); Rood Aff., Def. Ex. 28 at 5–7 (opining that Schamann's duties are consistent with his level GS–13 PD and that it is not responsible to promote Schamann based on his performance).

In addition to the foregoing evidence, Defendant has shown that Schamann effectively received a second bite at the apple in the form of a Phase II review of his position classification by the Director of the Applied Engineering and Technology Directorate, Arthur Obenschain. Although Schamann requested that Obenschain pay particular attention to his evaluation, and was given extra time to submit a rebuttal to his supervisors' evaluation, Schamann now contends that this Court should not consider Obenschain's evaluation, because it was not based on "OPM classification and parallel agency standards that governed accretion promotions prior to and during the Fishgold classification study." Pl. Mem. at 21. The Court however finds the evidence to be relevant, if not cumulative, inasmuch as it reflects the consensus among Plaintiff's supervisors that Plaintiff was not performing at a level that warranted reclassification of his position to a higher grade.

On balance, the Court finds that Schamann has not presented evidence sufficient

to raise a genuine issue of material fact as to whether he qualified for an accretion promotion to GS–14.

### b. *Circumstances Giving Rise to an Inference of Discrimination*

Even if a reasonable jury could find, based on the Fishgold report and Schamann's affidavits, that Schamann's performance and responsibilities warranted a level GS–14, Schamann has not met the fourth element of his *prima facie* case, because he has not identified any similarly situated person outside his protected classes who was promoted. Schamann has conceded that he is unable to do so. *See* Def. Ex. 3A at Ex. 2, ¶ 3.a. ("I cannot identify any specific individuals who have been promoted to GS 14 or higher positions based on an accretion of duties or through competitive or non-competitive procedures during the relevant time period as a result of my status at the agency."); Schamann Dep., Def. Ex. 9 at 51–73.

Plaintiff's claims of race and gender discrimination are further undermined by statistical data showing that Caucasian males were the predominant recipients of accretion promotions within the Earth Sciences Directorate. Between January 2001 and July 2001, the Director of the Directorate, Einaudi, promoted fifteen employees from the entire three hundred thirty pool of employees based on an accretion of duties. Einaudi Aff., Def. Ex. 29, ¶ 6. Of those fifteen, eleven were Caucasian males, two were Caucasian females, one was an African–American male, and one was an Asian male. *Id.* No female, non-Caucasian employees were promoted through accretion.

Moreover, the demographic breakdown of Directorate employees who are similarly situated to Plaintiff and who received accretion promotions does not support Schamann's claims. Between January 1, 1998 and July 11, 2003, only four Computer Engineers within the Earth Sciences Directorate received accretion promotions to GS–14. Three of those four individuals were Caucasian males over the age of forty, while the other was an Asian male over the age of forty. None of these four were from the Plaintiff's branch, and only one is from his division. The Computer Engineer from Plaintiff's division who received an accretion of duties promotion to GS–14, James Tilton, is a Caucasian male born in 1953. Tilton holds a Ph.D. in Electrical Engineering, has published numerous articles, book chapters, and technical reports, and was promoted from a GS–13 Computer Engineer to a GS–14 following Obenschain's Phase II review of his file and qualifications.[6] Thus, Schamann has not offered any evidence establishing that minority female employees under age forty (or any employee possessing one or more of those characteristics) received any preference with respect to accretion promotions during the period giving rise to this action.

Similarly, Schamann has not demonstrated any other circumstance from which unlawful discrimination may be inferred. Schamann's argument that a reasonable jury could infer discrimination from his membership in protected classes, his assessment of an increase in his duties and responsibilities, Zukor's and Bennett's statements, and the Fishgold report (which did not address Plaintiff's allegations of discrimination or retaliation) has been addressed and rejected by this Court. Because Schamann cannot establish a *prima facie* case of race, sex, or age discrimination with respect to his denial of an accretion promotion, Defendant is entitled to summary judgment on Counts I, II, and III of the First Amended Complaint.[7]

---

**6.** Schamann has not challenged Tilton's qualifications for promotion.

**7.** The Court notes that the parties' arguments with respect to the pretext prong of

## II. *Plaintiff's Retaliation Claim*

In Count IV of his Amended Complaint, Schamann alleges retaliation in violation of Title VII and the ADEA. It is well established that an employer may not retaliate "against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in [a covered] investigation, proceeding, or hearing ...." 42 U.S.C. § 2000e–3(a).

■ To establish a *prima facie* case of discriminatory retaliation, Schamann must show: (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that a causal relationship existed between the protected activity and the adverse action. *Causey v. Balog,* 162 F.3d 795, 803 (4th Cir.1998).

If a plaintiff establishes a *prima facie* case, the employer may rebut it by offering a legitimate non-discriminatory reason for the action. *See Karpel v. Inova Health Sys. Servs.,* 134 F.3d 1222, 1228 (4th Cir. 1998). If this occurs, the plaintiff bears the ultimate burden of showing that the employer's stated reason is a pretext for retaliation. *Id.* Without sufficient evidence to permit a rational fact finder to conclude that the stated reason is a pretext for retaliation, the employer is entitled to summary judgment. *Id.* at 1229.

Defendant does not dispute that Schamann has repeatedly engaged in protected activities by filing grievances and informal and formal EEO complaints. Thus, Schamann has satisfied the first element of his *prima facie* case. The incidents Schamann claims constitute retaliatory adverse employment actions are analyzed below.

### A. *Schamann's Non–Promotion to GS–14*

■ Schamann contends that his non-promotion to GS–14 through an accretion of duties was in retaliation for his filing of successive EEO complaints. Defendant contends that Schamann's reassignment to the 2002 PD, which classified Schamann's position as a GS–13, was not an adverse employment action. The 2002 PD did not alter Schamann's organization, position, classification, title, series, or grade. Def. Ex. 16 at 1. "It has long been clear that the failure to promote an employee constitutes an adverse employment action for the purposes of [Title VII.]" *Bryant v. Aiken Regional Med. Ctrs., Inc.,* 333 F.3d 536, 544 (4th Cir.2003) (citing *Von Gunten v. Maryland,* 243 F.3d 858, 865 (4th Cir. 2001); *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981)). Thus, the Court finds that Schamann suffered an adverse employment action.

Schamann has not presented evidence sufficient for a reasonable jury to find that the Agency's failure to promote him to GS–14 was the result of his complaints

---

the *McDonnell Douglas* standard are identical to the arguments considered in connection with the establishment of the *prima facie* case. In this case, the Court has determined that the record is insufficient to warrant even a presumption of unlawful discrimination. However, had the Court determined that Schamann had carried his initial burden, the outcome would be the same. Defendant has proffered that Schamann's non-promotion to GS–14 was motivated by a legitimate, non-discriminatory reason: Schamann is not performing duties and responsibilities commensurate

with the GS–14 level. Schamann's burden is to adduce evidence "that the proffered reason was not the true reason for the employment decision," and that he was not promoted because of his race, sex, and age. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 508, 113 S.Ct. 2742; *see also Reeves v. Sanderson Plumbing Prods.,* 530 U.S. at 143, 120 S.Ct. 2097. Schamann has failed to produce any evidence to overcome the Agency's proffered legitimate reasons and to show that he was not promoted because he is a Caucasian male over age forty.

about suspected discrimination. The Agency has provided substantial evidence that, upon review of Schamann's duties and responsibilities, including several new responsibilities included at Schamann's request in the 2002 PD, it determined that the position did not warrant classification at the higher GS–14 level. In addition, Schamann's supervisors did not feel that Schamann had, when compared with other candidates who had received accretion promotions, enhanced his position or performed at a level that justified the increase. Schamann's own statements as to the duties he had accreted, which were incorporated in the Fishgold report prior to verification by the Agency, are insufficient to create a material factual dispute as to the causation element of the *prima facie* case. *See Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir.1988) (stating that the plaintiff's own opinions and conclusory allegations do not have sufficient "probative force to reflect a genuine issue of material fact").

B. *Language Contained Within Schamann's 2001 Performance Appraisal and OIG Investigation for Illegal Lobbying Activities*

On October 2, 2001, while the parties were engaged in mediation relating to Schamann's EEO complaint for non-promotion, Bennett provided Schamann with a draft of his annual performance appraisal. Although the performance appraisal rated Schamann as "meets expectations," the narrative portion of that review contained the following statement: "The marketing campaign used by ... Mr. Schamann

among his government peers have resulted in additional funds being directed to the [Earth Alert System] project as well. Coupled with external funding efforts by Aptec [sic], the EAS project will be continuing the integration of proposed enhanced via a Small Business Innovative Research (SBIR) Program Phase III." Def. Ex. 4 at Ex. 6, p. 68. Although Bennett was attempting to credit Schamann with creating alliances with his government peers at other agencies and optimizing the use of funds procured by the contractor independently, Schamann interpreted the statement to mean that he was assisting AEPTEC in illegal lobbying activities. Def. Ex. 4 at Ex. 7, pp 78–79. Schamann asked Bennett to remove the language. On December 19, 2001, Bennett provided Schamann with a revised draft of the annual performance appraisal that contained slightly different language:

The strategies (e.g., project briefings, technology demos, collaborative partnership building) used by [ ] Mr. Schamann among his government peers have resulted in additional funds being directed to the project. With external funding efforts by Aptec [sic], the EAS project will continue to infuse proposed innovative technology enhancement by Aptec [sic] via a Small Business Innovative Research (SBIR) Program Phase III.

Def. Ex. 4 at Ex. 4, p. 33. Schamann requested reconsideration of the language by Zukor, *id.* at Ex. 4, p. 34, but refused to help Bennett revise the appraisal, *id.* at Ex. 7, p. 79. On March 26, 2002, Schamann filed an informal EEO complaint, claiming that Bennett retaliated against him by including the remarks in the performance appraisal.[8]

---

8. The Court notes that the disputed 2001 performance appraisal language is substantially similar to the language contained in Schamann's 1998 and 2000 performance appraisals, both of which occurred before Schamann engaged in any protected activity. Specifically, Schamann's 1998 appraisal stated, in pertinent part: "[t]hese collaborative efforts are

primarily responsible for an increase in funding to the project from external sources to develop the prototype system of EAS with APTEC." Def. Ex. 37A. Schamann's 2000 performance appraisal referred to "external sources to develop the prototype system of EAS with APTEC Incorporated via the Small

■ On May 6, 2002, Einaudi transmitted an e-mail to the entire Directorate staff reminding them that it is illegal to lobby Congress or to cause contractors to lobby Congress. Schamann interpreted this e-mail as threatening administrative or criminal action based on the alleged references to lobbying activities made by Bennett in the performance appraisal and filed a formal EEO complaint on May 29, 2002.

■ On June 27, 2002, investigators from the Office of the Inspector General of NASA and the Department of Defense interviewed Schamann about the activities of an AEPTEC employee described to be a registered lobbyist who charged time to the contract for which he served as Project Manager and contractor's representative. On July 23, 2002, Schamann filed an informal EEO complaint alleging that Bennett and Einaudi caused an OIG investigation of him in retaliation for his EEO activities. Ultimately, GSFC issued a final agency decision sustaining EEO's rejection of the complaint for failure to state a legally valid claim. The EEOC denied Schamann's appeal of the Agency decision, rendering the issue ripe for consolidation in this lawsuit.

Schamann's retaliation claims related to this series of events fail because no reasonable jury could find that the statement in the performance appraisal, the e-mail from Einaudi, or the OIG investigation constituted adverse employment actions. The language in the performance appraisal did not materially affect Schamann's terms or conditions of employment, nor did it diminish his rating of "meets expectations." Schamann's subjective belief that inclusion of the language might lead to administrative or criminal action against him is insufficient to create a genuine factual dispute. *Page v. Bolger,* 645 F.2d at 233 (specula-

tion of future harm can hardly be considered an "ultimate employment action"); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir.1995) ("Mere unsupported speculation ... is not enough to defeat a summary judgment motion.").

Similarly, Schamann's subjective belief that Einaudi's e-mail and the OIG investigation targeted him for activities referenced in the performance appraisal are wholly unsupported by the record. Einaudi testified that his May 6, 2002 e-mail "was in response to two issues about ... the appropriateness of a contractor being part of a lobbying effort and ... the extent to which civil servant scientists should discuss science issues with individuals who may turn out to be lobbyists." Def. Ex. 4 at Ex. 8, p. 103. Neither issue involved Schamann. *Id.* Likewise, Schamann acknowledged that the OIG investigators were looking into the activities of a paid lobbyist working on Schamann's contract, that OIG did not indicate that Schamann was doing something improper, and that no disciplinary or criminal action has occurred as a result of the investigation. Schamann Aff., Def. Ex. 9 at 220–224. Plainly, the e-mail and investigation do not constitute adverse employment actions.

## C. *Denial of a Discretionary Cash Award for 2001*

Schamann next alleges that his failure to receive a discretionary cash bonus in 2001 was in retaliation for engaging in protected activity. In support of his argument, Schamann relies on the cash awards he received in 1996, 1997, 1998, 1999 and 2000, under Bennett's supervision, in the amounts of $350, $601, $750, $1,000, and $1,300, respectively. Additionally, Scham-

Business Innovative Research (SBIR) Program" and stated that "the GSFC Technology Commercialization Office (TCO) has renewed its funding commitments to EAS based on these newly established partnerships for FY 99 and FY 00." Def. Ex. 37B.

ann notes that in 2001 the Earth Alert Project that he worked on received the GSFC National Resources Medal and the Tibbets Award.

■ As a matter of law, however, the non-receipt of a discretionary bonus does not constitute an adverse employment action. *See Rabinovitz v. Pena,* 89 F.3d 482, 488–89 (7th Cir.1996) (lowered performance evaluation of "fully successful" which prevented plaintiff from obtaining discretionary bonus did not constitute adverse employment action under Title VII); *Harrington v. Harris,* 118 F.3d 359, 366 (5th Cir.1997)(employer's failure to award discretionary merit pay increases did not constitute adverse employment action). Although Schamann had received performance awards in previous years, he has not established that such bonuses were mandatory, as opposed to discretionary, or that they comprised part of his compensation package.

In addition, Schamann has not demonstrated any nexus between his engaging in protected activity and the denial of the award in 2001. It is undisputed that, as early as 1999, Schamann had expressed concern to his supervisors, including Bennett, that his non-promotion to GS–14 resulted from discrimination. However, as previously noted, Schamann received discretionary bonuses for fiscal years 1998 through 2000, despite his ongoing complaints of discrimination. Schamann's inference of a causal link between his failure to receive a cash award and engaging in protected activity lacks any evidentiary support. *See, e.g., Olivares v. Nat'l Aeronautics & Space Admin.,* 934 F.Supp. 698, 705 (D.Md.1996) (assertion of causal connection simply because certain events occurred after plaintiff initiated protected activity is, in the words of Judge Messitte of this Court, "the classic *post hoc ergo propter hoc fallacy.*").

**D.** *Denial of Funding for Hawaii Conference*

■ Finally, Schamann contends that NASA retaliated against him when it denied his request for funding to attend a conference in Hawaii in 2001. NASA's denial of funding for a non-essential conference plainly does not materially affect the terms, conditions and benefits of Schamann's employment and does not, therefore, constitute an adverse employment action. *See Von Gunten v. Maryland,* 243 F.3d 858, 866 (4th Cir.2001). Moreover, Schamann has not forwarded any evidence showing that other, similarly-situated employees who had not previously filed EEO complaints did, in fact, have such requests granted.

Apart from his own opinion, Schamann has not offered any evidence demonstrating a causal connection between his protected activity and an adverse employment action. Thus, Defendant's motion for summary judgment as to Count IV of the Plaintiff's Amended Complaint will be granted.

### CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment will be GRANTED. A separate order follows.

### ORDER AND JUDGMENT

Upon consideration of Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment (Paper No. 15), Plaintiff's Memorandum in Opposition thereto, and the documents submitted in connection therewith, and for the reasons set forth in the accompanying Memorandum Opinion, IT IS, this 21st day of April, 2004, HEREBY ORDERED:

1. That Defendant's Motion for Summary Judgment is GRANTED;

2. That judgment be ENTERED in favor of Defendant and against Plaintiff; and

3. That the Clerk of Court transmit copies of this Order and the Memorandum Opinion to counsel for the parties.